

Gordon Mehler
*Principal*

Rebecca Campbell
Diane Ferrone
Sarah Lum
Daniel Rothstein
Harvey Stuart
*Of Counsel*

Rick Guimond
Ben Stadler
*Paralegals*

May 27, 2020

**BY ECF**

The Honorable Rachel P. Kovner
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: <u>*United States v. Keith Levy*, 1:20-cr-87 (EDNY) (RPK)</u>

Dear Judge Kovner:

      I write to provide the Court with an update in the Keith Levy case, and I do so in anticipation of the next status conference on June 1 at 2 pm. This letter tries to sketch : a) a summary of the single charge in this case and Mr. Levy's limited potential criminal exposure, which, remarkably, could mean that, if he is not at least temporarily released on Monday, *he might remain in a COVID-19-infested federal prison longer than if he had been convicted after trial*; b) some of the case background, though much is not yet known and cannot presently be investigated due to the continuing pandemic limitations; c) case complications before the COVID-19 crisis became a full-blown one; d) the myriad difficulties of preparing this case for trial in the coronavirus environment where lawyers (not just me) cannot form even an elementary bond of trust and openness with their new, imprisoned clients, let alone obtain the essential attorney-client time and space to dig down into the facts and carefully and thoroughly fashion a defense strategy.

      At the end of this presentation, I believe the Court should conclude that, unless Mr. Levy is temporarily released, as other recent defendants have been (pursuant to Title 18, United States Code., Section 3142(i)), and afforded conditions even minimally conducive to preparing his case for trial (such as the ability to speak by telephone, uninterrupted, for more than a couple of times a week for very limited periods), any claim to elementary due process and the right to counsel will be no more than a charade.

## A. Charge and Likely Exposure

Mr. Levy has been in custody, initially on a state warrant, for just about four months--since February 4, 2020. ECF Dkt. No. 1. On February 21, he was indicted, pursuant to Title 18, United States Code, Section 875(c), on a one-count interstate threat charge. ECF Dkt. No. 7. He had previously been charged in a federal complaint on February 10, which alleged that, on a telephone call to a third party, he intended to issue a true threat to do serious bodily harm to his parole officer. ECF Dkt. No. 1. The alleged crime involved only a single course of conduct that occurred during a narrow time frame at the end of January 2020. Whatever was allegedly said, the discovery reviewed so far confirms Mr. Levy's fear and agitation over the recent murder of a relative, among other things, as well as a strong perception of dehumanizing or degrading treatment by a law enforcement officer who exercised plenary power over his life. And by the way, there is not even a recording of the alleged true threat supposedly conveyed through a third party. ECF Dkt. No. 10 at 5. Nor were there any post-arrest statements. *Id.* at 8.

Thus, Mr. Levy's conviction after trial seems somewhat unlikely, especially given the need to prove beyond a reasonable doubt more than a frustrated outburst reasonably perceived by outsiders as a threat. *See Elonis v. United States,* 575 U.S. 723 (2015) (reversing for legal insufficiency convictions based, among other things, on social media posts where defendant asked whether order of protection obtained by his wife was "thick enough to stop a bullet?; mused on how he would draw "my knife, flick my wrist and slit [the] throat [of a female FBI agent].... I'm just a crazy sociopath;" and opined that there are "[e]nough elementary schools in a ten-mile radius to initiate the most heinous school shooting ever imagined.... The only question is... which one?").

Even if Mr. Levy is, in fact, ultimately convicted after trial, a preliminary United States Sentencing Guidelines calculation shows that he faces a Base Offense Level of 12, and a decrease of four points where the conduct consisted of a single instance "with little or no deliberation." U.S.S.G. Section 2A6.1 (a)(1) & (b)(6). Even if we assume a Criminal History Category of III (a score of four to six points), Mr. Levy's suggested sentencing range of six to 12 months would make him eligible for community confinement. He then could resume working, possibly as he had been once before in a job as a package handler for Federal Express. And even if the minimum guideline range was upped to 10 to 16 months by virtue of a Criminal History Category of IV, Mr. Levy would still be eligible for a split sentence, with only five months in a prison, *barely a few weeks more than he has already served even under this harsher estimate with 7, 8 or even 9 criminal history points. See* U.S.S.G. Section 5T 1.1 (d)(2); ECF Dkt. 20 at 4.

## B. Case Background and Benefits of Temporary Release

We attach as Exhibit A the transcript of Mr. Levy's 2006 sentencing. It demonstrates that he grew up poor in a horrific neighborhood of everyday shootings, and was shot himself as a teenager and allegedly tried to retaliate against the person he suspected of trying to kill him. He and a co-defendant were said to have aimed only at the lower extremities, but missed and wounded others--none seriously, thank God, but he still received a sentence of 14 years from an upstate judge. He was only 18-years-old at the time. Though the co-defendant fired most of the shots, though his counsel found Mr. Levy uncomplaining and easy to deal with, and though the judge fully credited that Mr. Levy had been raised in "basically, a war zone," i*d.* at 13, Mr. Levy would not emerge from prison until last year.

Mr. Levy struggled to adjust on parole to a world he never really had known as an adult. He was barred from the 73rd New York Police Dept. precinct (Ocean Hill- Brownsville) due to gang activity in the area, even though that is where his mother lives. ECF Dkt. No 17 at 1. After the nearby shooting where someone close to hm was murdered, text messages in the discovery readily establish the depressed and plaintive state he was in, trying to survive and stabilize his life with little help or sympathy from the responsible authorities. Because he knew a shooting victim, one suspicion (no more than that at this point) is that some task force or other law enforcement agency was trying to put pressure on him, even if he did not have the information they wanted.

Meanwhile, New York State Parole was trying to violate him. They had done so earlier in the year when he was found in a location near his mother, though he was not accused of any criminal activity. Ultimately, Mr. Levy was restored to parole. But after the alleged incident in the indictment, Parole decided to try to violate him again. It filed a warrant to remand him, and had about three months from February to hold a hearing on any charges. But then it never bothered to follow through, even though these state proceedings take place routinely at the Metropolitan Detention Center, where Mr. Levy was initially housed. On the 91st day after time had expired, Caitlin Miller, Mr. Levy's state Parole indigent defense lawyer, demanded that the parole warrant against Mr. Levy be lifted because of this untimeliness. I am attaching as Exhibit B, Ms. Miller's recent exchanges with New York State Parole, which has proffered its unconvincing excuses. I have asked Ms. Miller to appear with me on June 1st to answer any questions the Court may have about the process while this is parole case is being fought out.

One important question is: can Ms. Miller even engineer a successful dismissal of the now time-barred parole violation charge if Mr. Levy is no longer on Rikers Island? Ms. Miller now tells me the answer is no, based on jurisdiction. Does this mean Mr. Levy has to return to the charnel house that is now Rikers Island to obtain this Catch-22 relief, where more than 1,000 guards, let alone prisoners who remain largely untested, have caught the virus? It seems that, even if this Court temporarily releases Mr. Levy, it can do so only conditionally because of the continuing parole hold. After all the twists and turns, what a royal mess!

Nevertheless, temporary release, conditional or not, is the most sensible option here short of dismissal of the charge. Under 18 U.S.C. § 3142 (i), enacted as part of (the Bail Reform Act of 1984, this Court may order Mr. Levy's temporary release when "necessary for preparation of [his] defense or for other compelling reason," such as these unprecedented health concerns, the seemingly interminable parole battle, and the almost total resulting inability to prepare this case for trial, as detailed more fully below.

Recent case law within the Second Circuit fully supports this discretionary alternative. Judge Nathan, in a drugs and guns case, and over the government's objection, was the first to employ this provision in a COVID-19 context in *United States v. Stephens,* 15-cr-95 (AJN), 2020 WL 1295155 (S.D.N.Y. Mar. 19 2020). Like this case, the defendant argued both health and trial preparation right to counsel points. Judge Nathan did not feel she needed to even reach the medical point because she found that the "obstacles the current health crisis poses to the preparation of the Defendant's defense constitute a compelling reason under 18 U.S.C. § 3142 (i)." *Id.* at *5. No monetary bail conditions were even imposed, only the requirement that the defendant live with his mother under 24-hour home detention with electronic location monitoring. *Id.* at * 6; *see also United States v. Perez,* 19-cr-297 (PAE) (S.D.N.Y. Mar. 19,2020), where Judge Engelmayer employed Section 3142 (i) to temporarily release a defendant

3

solely due to COVID-19). We also note *United States v. Chandler*, 19-cr-867 (PAC) (S.D.N.Y. Mar. 31, 2020), where, over the government's objection, Judge Crotty temporarily released the defendant also due to trial preparation concerns, even though the defendant was charged in a gun case and previously had been convicted of manslaughter. The temporary release was capped at 60 days, and 24-hour home incarceration mandated, but the monetary conditions of release were minimal, apparently given the family poverty: two responsible sureties co-signing a $50,000 bond.

Other judges seemingly have done the same without formal opinions., *See, e.g.,* Judge Chen very recently in *United States v. Harris*, 18-cr-330M (PKC) (E.D.N.Y. May 18, 2020). There, Federal Defenders used this temporary release provision to argue Sixth Amendment concerns combined with serious general health concerns. We attach as Exhibit C Judge Chen's release order with no reasons stated, along with the memorandum of Michelle Gelernt, my predecessor in this case, who brought *Harris* to our attention. The Court should enter an order for temporary release here, not only because of the COVID disaster and its effect both on health and on case preparation, and not only because of the very likely injustice of further delays previously discussed, but also to insure that if the parole hold is resolved, Mr. Levy can be released forthwith to begin working in earnest with his defense team.

Adding ballast to this argument, one additional question about the case that leaps out is: why is this a federal case? Is there perhaps some so far unseen agenda in utilizing the resources of this Court? A parole violation, as I have come to understand it from Ms. Miller, could send Mr. Levy up the river again for 12 months under certain conditions, though it would be cruel to do so. But if the parole case is so airtight, why then pile on, especially with such an iffy and duplicative federal charge?

In my nearly 37 years of federal criminal work (17 as a law clerk, Eastern District AUSA and Justice Department bureaucrat, and almost 20 as a defense lawyer), I have encountered interstate threat cases on three occasions. First, as a new prosecutor on arraignment duty, I was assigned a couple of them. To my memory, they ended up with psychiatric dispositions. (There is no doubt that Mr. Levy was prescribed mental health treatment as part of his release from state custody, but again I have been unable to even size up my client's psychological disposition.) Second, I defended one such case before Judge Buchwald in the Southern District some years ago, which yielded a deferred prosecution agreement. Third, Mr. Levy's prior counsel, Ms. Gelernt, also brought to our attention *United States v. Segui,* No. 19-cr-188 (KAM), 2019 WL 8587291 (E.D.N.Y. Dec. 2, 2019*)*, a recent case before Judge Matsumoto. There, a disgruntled former student threatened to travel to Michigan to cut off his former professor's fingers. He purchased a hatchet on Amazon, and was arrested as he was about to board a bus to Michigan with the hatchet. He admitted to arresting officers that he was traveling to kill his professor. Despite this much stronger case than that of Mr. Levy, Mr. Segui was understandably acquitted after trial, no doubt because the jury felt the defendant needed treatment, not prison.

### C. Case Complications Before Our Office Replaced Federal Defenders

Your Honor took over this case from Judge Block on March 10. ECF Dkt. No. 10 at 3. By March 17, the Federal Bureau of Prisons had suspended all social and legal visitation, as the COVID-19 cataclysm began taking hold. Ms. Gelernt immediately voiced her "concerns regarding my ability to effectively prepare Mr. Levy's trial should he remain in federal

detention." ECF Dkt. No. 11 at 1. Because Rikers Island had not yet cancelled legal visitation, and Mr. Levy had his own reasons for going there, a transfer was effectuated. ECF Dkt. No. 15. But Rikers Island quickly shut down too after it reported its first COVID-19 case on March 18. By early April, the rampant infection rate at Rikers Island "was nine times higher than all of New York City, 11 times higher than Italy's Lombardy region and 44 times higher than China's Hubei Province." ECF Dkt. No. 16 at 2 (quoting Reuters article).

On April 4, Ms. Gelernt sought to modify Mr. Levy's bail conditions, seeking his conditional release as soon as the parole violation proceeding was cleared up, with a purported May 18 deadline for this to happen. ECF Dkt. No. 16 at 3. The prosecution opposed any modification, an inflexible posture it continues to maintain. It argued risk of flight, though when Mr. Levy departed to see an aunt in Georgia, there was no warrant lodged against him--indeed the alleged threat came only after he had arrived in Georgia. It also argued dangerousness, playing up his teenage conviction for which he had already paid dearly his debt to society, and without the necessary context we have provided, so as to make Mr. Levy look worse than he was at age 18. The prosecution also noted four times that Mr. Levy allegedly "threatened to shoot a senior parole officer in the face," ECF Dkt. No. 17 at 3, though the complaint pointedly does not make this specific allegation, ECF Dkt. No. 1 at 3 (alleging that Mr. Levy claimed to someone else he wanted to punch her in the face).

Chief Magistrate Judge Pollak heard the application on April 9. ECF Dkt. No 20. Judge Block had not previously heard a bail application because no Pretrial Services report had been prepared. ECF Dkt. No. 10 at 7. Although Judge Pollak denied the bail application, it was not based on any bail package at all beyond a request for release on recognizance, *Id*. at 13-14, a circumstance that has now changed. Mr. Levy's father, Keith Levy Sr. employed by the Harlem YMCA, and his homemaker mother, Janine Joseph, are now available to sign what I propose to be an unsecured bond in the same amount that Judge Crotty set in *Chandler*: $50,000. In addition, Mr. Levy will live wherever PTSO Robert Stehle directs him to live under whatever conditions the Court imposes. This temporary release, again, provides the only reasonable hope of being able to prepare this case for trial in anything approaching a constitutional time frame.

### D. Present Myriad Difficulties in Even Gaining Access to Our Client

Ms. Gelernt and Mr. Levy parted ways in April for reasons that remain confidential, and Federal Defenders moved to withdraw. ECF Dkt. No. 21. Our office was formally appointed on May 7. ECF Dkt. No 30. Meanwhile, at an April 22 status conference, Mr. Levy reported to Your Honor personally on the terrible conditions at Rikers Island and his virtual inability to schedule legal calls through the institution. ECF Dkt. No 25. At the same conference, the Court adjourned his trial *sine die* because of the continuing paralysis growing out of the virus, and Mr. Levy was then transferred back to MDC. *Id*. Finally, his release to be transferred to Rikers Island in the first place was revoked on May 14, which ensures his continued lodging at MDC-- until he is seemingly forced to go back to Rikers Island. ECF Dkt. No 32.

I was not able to arrange any legal calls with Mr. Levy at Rikers Island, but this changed when he came back to MDC earlier in May. Since then, my colleague Ortal Isaac has diligently adhered to a new MDC protocol on legal calls. One must give two days' notice, and as soon as we are done with one call, we schedule the next one. But in the few weeks since we began, it has amounted to little more than treading water. Indeed, one week we had no calls at all because MDC was overloaded on Mr. Levy's floor. (Now he is on a different floor.) As I write this, our

5

call scheduled for Tuesday also did not take place, so last night we wrote again, insisting that we needed to firm up some details for this filing, which we had hoped to submit earlier. Today again, our call request came up dry: the phone never rang. We attach relevant e-mails as Exhibit D to give the Court a flavor of the continuing obstacles involved.

In the more than 400 matters I have handled as a defense attorney over just under two decades, the process is usually the same. We get to know the client slowly. We take them to lunch or, if imprisoned, we come to the prison with dollar bills and buy multiple Cokes and bags of chips. Clients often meet at our office and even at my family apartment, where we begin a slow process of building trust. Meetings routinely last two to three hours and even more.

If a client is imprisoned, it generally takes a dozen or more multi-hour meetings for that client to begin to get comfortable with us. And after all, as a former prosecutor who worked in a system that has given Mr. Levy nothing but heartache for so long, it is insane to believe that he will suddenly trust me, confide in me, strategize with me. (My distinguished predecessor by contrast, who was relieved, has been an indigent defense lawyer, both state and federal, for an entire 26-year period.) I was naïve, indeed clueless, about this reality even as a senior prosecutor. I never really understood how the very gradual bonding between a criminal defense lawyer and his/her understandably mistrustful client occurs. I thought a defense lawyer could go from zero to 60 in a couple of sessions, that it was like the bond between an AUSA and his/her case agent—to which it actually bears almost no resemblance.

In addition to the inherent difficulties in any new criminal defense representation, particularly where a lawyer and a client's backgrounds are starkly different, there are so many diverting preliminary matters to attend to when a client is imprisoned and has only a few minutes to talk. When will a commissary account be transferred? Where can a client live if he is released? Whom shall one call as potential sureties and how shall the lawyer approach them? What are appropriate tips for personal COVID-19 safety? What is the prosecutor like? What is the judge's reputation? What are some reasonable timelines? What if this happens? What if that happens? And on and on. If an average call lasts only 10 to 30 minutes an average of twice a week, and this week none at all so far, the Sixth Amendment becomes a joke. In this case, that is exactly what it has become, though perhaps farce is the more polite term.

**E. Sixth Amendment and Health Concerns**

The Sixth Amendment right to counsel is the cornerstone of our adversarial system of criminal justice. As the Second Circuit recently emphasized, "the right to consult with legal counsel about being released on bond, entering a plea, negotiating and accepting a plea agreement, going to trial, testifying at trial, locating trial witnesses, and other decisions confronting the detained suspect, whose innocence is presumed, is a right inextricably linked to the legitimacy of our criminal justice system." *Federal Defenders of New York, Inc. v. Bureau of Prisons,* No. 19-1778 (2d Cir. Mar. 20, 2020). In recognition of this vital right, BOP regulations instruct that detention center wardens "shall provide the opportunity for pretrial inmate-attorney visits on a seven-days-a-week basis." 28 C.F.R. § 551.1 17(a).

A detention facility violates the Sixth Amendment when it "unreasonabl[y] interfere[s] with the accused person's ability to consult counsel." *Benjamin v. Fraser*, 264 F.3d 175, 185 (2d Cir. 2001). In *Benjamin*, the Second Circuit held that New York City correctional facilities violated the right to counsel when defense attorneys "routinely face[d] unpredictable, substantial

delays in meeting with clients" and were "forced to wait between 45 minutes and two hours, or even substantially longer, after arriving at a facility to see a client. 264 F.3d at 179. Yet, the circumstances and conditions contemplated by the Second Circuit in *Benjamin* pale in comparison to those that Mr. Levy has been forced to endure. In *Wolfish v. Levi,* " 573 F.2d 118, 133 (2d Cir 1978), *rev'd on other grounds*, 441 U.S. 520 (1979), the Second Circuit held that a detention facility (the Westchester County Jail) "severely constrained" an inmate's "access to legal counsel" where dedicated attorney visiting hours were limited to two hours a day, let alone less than half an hour with two days' notice.

Because MDC has suspended all visitation, Mr. Levy's primary means of communicating with counsel has been through severely time-limited telephone calls. These communications have been shown to be possible only on a haphazard basis. Conducting substantive, meaningful discussion of topics critical to the defense has been nearly impossible. Moreover, Mr. Levy cannot even be assured that our calls are truly private, as others are in proximity. Additionally, in the likely event that infections continue at MDC, the facility essentially freezes, further inhibiting Mr. Levy's constitutional rights. This is not an abstraction. When inmates at MDC tested positive for the coronavirus, we understand that the facility went on lockdown during which time no inmates are allowed into or out of their areas.

The statistics are not encouraging: As of May 25, New York has over 367,000 COVID-19 cases, far more than any other state. *See COVID-19 cases in New York*, available at https://www.nytimes.com/interactive/2020/us/new-york-coronavirus-cases.html (updated daily). The country's leading post-sentencing remedies attorney, Alan Ellis, noted in a recent posting that if the Federal Bureau of Prisons were a country, it would have the highest rate of infection in the world by far because about 2,400 BOP inmates have tested positive for the virus as of earlier this month, and without full testing, the number is likely far higher. *See* www.alanellis.com/news/blog (May 7, 2020). Finally, although we have been unable to confirm this through current MDC medical records that we have reviewed, prior counsel has represented in court that Mr. Levy has in the past been treated for tuberculosis. ECF Dkt. No. 20 at 10. Indeed, we will request on Monday that the Court order that Mr. Levy be formally evaluated for tuberculosis if the Court decides not to temporarily release him.

**F. A Late Update**

As we were double-checking and otherwise finalizing this letter today, and, for a second day, waiting for the client call from MDC that never came, I spoke again to Ms. Miller to be able to give the Court and the prosecution the latest news on Mr. Levy's maddening parole situation. Apparently spooked by Ms. Miller's insistence that any hearing is now time-barred, the parole authorities have suddenly scheduled a hurry-up final hearing for this Friday. But I am skeptical that the parole hold will be resolved then. Meanwhile, Mr. Levy reserves all of his constitutional rights: to counsel, to speedy trial, to trial by jury, to traditional in-person confrontation--thereby naming just a few rights that are in danger of being lost if the status quo continues.

\*   \*   \*   \*   \*

In conclusion, now that Your Honor has been provided with a more contextual portrait of this case and its discontents, I hope the Court will conclude, as it should, that unless Mr. Levy is

7

at least temporarily released to meaningfully prepare for trial with counsel, due process here will remain out of reach, and any talk of a fair trial would be a waste of time.

                                      Respectfully,

                                            /s/

                                      Gordon Mehler

cc:      AUSA Andrew Wang (by ECF)
          PTSO Robert Stehle (by e-mail)
          Public Defender Caitlin Miller (by e-mail)

Tel: (212) 661-2414 ♦ Fax: (212) 661-8761 ♦ E-mail: gmehler@mehlerlaw.com ♦ Website: www.mehlerlaw.com