

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

RMT:ADW
F. #2020R00142

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

October 26, 2020

**By ECF**

The Honorable Rachel P. Kovner
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

        Re:    United States v. Keith Levy
                  Criminal Docket No. 20-87 (RPK)
                  **ORAL ARGUMENT REQUESTED**

Dear Judge Kovner:

        The government respectfully submits this motion in limine in advance of the December 14, 2020 trial in the above-referenced case. The defendant is charged with transmitting an interstate threat to kill or injure, in violation of Title 18, United States Code, Section 875(c). As set forth below, the government seeks to admit certain witness testimony and other evidence regarding the defendant's criminal history and uncharged criminal conduct. Because such evidence is relevant to the government's case-in-chief and not substantially outweighed by unfair prejudice, the Court should grant the motion.

    I.    Factual Background

        On October 22, 2005, the defendant brandished a gun and fired into a crowd in front of a nightclub in Binghamton, New York. Although he missed his intended victim, several innocent bystanders were hit by bullets. On July 26, 2006, following a jury trial in New York state court, the defendant was convicted of second degree attempted murder, first degree attempted assault, second degree criminal possession of a weapon, and first degree reckless endangerment. The defendant was sentenced to 14 years' imprisonment and 5 years of post-release parole supervision.

        On December 17, 2012, while serving the above sentence in a New York state correctional facility, the defendant was found to be in possession of a shank. On April 11, 2014, the defendant pleaded guilty to first degree knowingly making or possessing dangerous

contraband in prison. For this crime, the defendant was sentenced to 18 months to 3 years of incarceration.

The defendant was released from state custody in May 2019. Upon his release, the defendant relocated to Brooklyn and began his term of parole under the supervision of the New York State Department of Corrections and Community Supervision ("DOCCS").

On July 27, 2019, a gunfight between at least two people erupted at the annual Old Timers Day event in the Brownsville neighborhood of Brooklyn, where hundreds of people were in attendance. One victim—Jason Pagan—was killed, and eleven other victims were shot but survived their wounds. Jason Pagan was killed by someone firing a 9mm handgun, which was recovered from the scene. Shell casings and other evidence showed that another shooter had fired a .40 caliber handgun. While New York state authorities eventually identified and arrested the person believed to have fired the 9mm gun, other individuals believed to be involved in the shooting remain at large.

Early on in the investigation of the Old Timers Day shooting, the defendant was identified as a person of interest and potential suspect for several reasons. For example, during a phone call with an inmate on Rikers Island on July 28, 2019, the defendant placed himself at the shooting, implied that Jason Pagan was the defendant's friend and expressed dismay that even though there were three guns "on our end," that "only one went off."[1] The defendant also said on the call that his group "fucked up" and that Pagan "wasn't ready." When the Rikers Island inmate said he had "heard you did your thing too," the defendant responded by saying "you already know how we play, nigga."

Additionally, within days of the shooting, an eyewitness identified the defendant from a photo array as being one of the shooters involved in the incident. And on July 31, 2019, the New York City Police Department ("NYPD") found the .40 caliber handgun used in the shooting hidden in a cable box in a stairwell just a few feet away from the defendant's mother's apartment, where the defendant was residing at the time. The NYPD later determined that while the defendant's DNA was not on the gun, the DNA of a friend of the defendant, who had also attended the Old Timers Day event, was on the gun. The NYPD informed DOCCS parole officers of these findings.

On August 9, 2019, two NYPD detectives interviewed the defendant regarding the Old Timers Day shooting. During that interview, the defendant categorically denied touching or having any involvement in guns, which he frequently referred to as "hammers," but admitted that he was at the event at the time of the shooting. The defendant also said that he had previously seen the .40 caliber handgun found next to his apartment "in the neighborhood" and that it belonged to Jason Pagan.

---

[1] During the conversation, the defendant references "hammers," a slang term for guns, several times.

Later in August 2019, the defendant was remanded to a New York state correctional facility due to certain parole violations. He was released in early October 2019. Upon the defendant's release, the DOCCS imposed a geographic restriction, prohibiting the defendant from entering the NYPD's 73rd Precinct (which includes the Brownsville neighborhood) because of the defendant's suspected involvement in the Old Timers Day shooting and at least one other shooting in Brownsville.

The defendant violated this condition by entering the 73rd Precinct on more than one occasion without prior authorization by the DOCCS. On January 16, 2020, the defendant appeared for a parole hearing in relation to his violation of the geographic restriction condition. The hearing was adjourned because of the unavailability of a witness. While leaving the hearing room, the defendant turned to his assigned parole officer and said to her, in sum and substance, "this is the last time you will play with my life."

On January 24, 2020, a senior parole officer (the "SPO") met with the defendant and required him to wear a GPS location monitoring device on his ankle as a new condition of supervision. Less than 12 hours later, on January 25, 2020, the defendant cut the GPS monitoring device off of his ankle and threw it down an incinerator in a residential building in Brooklyn. A parole officer responsible for monitoring the defendant's GPS location ("PO-1") learned of the defendant's actions and alerted the SPO on January 26. At the SPO's request, PO-1 then called the defendant, identified himself as a parole officer, and directed the defendant to report to a parole office on January 27. The defendant refused.

On January 27, the defendant failed to report to his parole officer. That evening, the SPO held a briefing with a team of parole officers (including PO-1) regarding the defendant and his status as a parole absconder. The SPO and the officers then unsuccessfully tried to locate the defendant at the defendant's mother's apartment in Brooklyn. In the lobby of the defendant's mother's apartment building, PO-1 called the defendant, who by this point was in Atlanta, Georgia. At the time of the call, PO-1 placed the call on speakerphone so the SPO and other members of the team were able to listen in, but PO-1 did not tell the defendant that others were listening in. During the call, the defendant refused PO-1's request to surrender. The defendant also said, in sum and substance, that he wanted to get "the hammer" and shoot the SPO in the face.[2] All of the officers who heard this statement interpreted it as a threat to do future violence to the SPO. The threat prompted DOCCS personnel to escalate their attempts to locate the defendant by seeking assistance from other law enforcement agencies. On February 4, the defendant was arrested in Atlanta, Georgia.

---

[2] The government anticipates that the defendant will argue that this statement was not a threat but an expression of past frustration and anger—specifically, that on January 24, 2020, he felt like getting a gun and shooting the SPO when the SPO required him to wear a GPS monitoring device.

3

The defendant was indicted by a grand jury sitting in the Eastern District of New York on February 21, 2020 and charged with a single count of transmitting an interstate threat to kill or injure the SPO, in violation of 18 U.S.C. § 875(c). See ECF Dkt. No. 7.

II. Applicable Law

    A. Existence of a "True Threat" and Defendant's State of Mind

To convict a person of violating 18 U.S.C. § 875(c), the government must prove that the person communicated a "true threat," which is a jury question. United States v. Sovie, 122 F.3d 122, 125 (2d Cir. 1997) (citing United States v. Kelner, 534 F.2d 1020, 1027 (2d Cir. 1976)); see United States v. Turner, 720 F.3d 411, 424 (2d Cir. 2013). A true threat is a statement "where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals," though the speaker "need not actually intend to carry out the threat." Virginia v. Black, 538 U.S. 343, 359-60 (2003). Ambiguous statements or implications can be true threats. See Turner, 720 F.3d at 424 (the "absence of explicitly threatening language does not preclude the finding of a threat") (citation omitted).

The test for whether a statement is a true threat is an objective one—"namely, whether an ordinary, reasonable recipient who is familiar with the context of the [threat] would interpret it as a threat of injury." Sovie, 122 F.3d at 125 (citation omitted). "[R]igid adherence to the literal meaning of a communication without regard to its reasonable connotations derived from its ambience would render the statute powerless against the ingenuity of threateners who can instill in the victim's mind as clear an apprehension of impending injury by an implied menace as by a literal threat." Turner, 720 F.3d at 422 (citation omitted).

"[P]roof of the effect of the alleged threat upon the addressee is highly relevant" to whether a statement is a true threat. United States v. Malik, 16 F.3d 45, 49 (2d Cir. 1994); see also United States v. Davila, 461 F.3d 298, 305 (2d Cir. 2006). Where threats are ambiguous, "the recipients' states of minds and their reactions" are particularly significant in "remov[ing] ambiguity by shedding light upon the contexts of the alleged threats." Malik, 16 F.3d at 50; see also Xiang Li v. United States, Nos. 07-CR-272 (DNH) and 11-CV-217 (DNH), 2016 WL 11082041, at *6 (N.D.N.Y. Oct. 14, 2016) (testimony regarding how witnesses perceived certain threats was relevant to whether statements were objectively threatening because "the context and content of these communications also confirm that they were intended to, and in fact did, frighten the victims, many of whom alerted police to these communications and altered their behavior in an effort to protect themselves from possible danger"). Evidence of a defendant's prior hostility towards the subject of a threat is also relevant to the issue of whether a statement is a true threat. See United States v. Santos, 801 F. App'x, 814, 817 (2d Cir. 2020) (finding of true threat against probation officer supported by defendant's previous expression of "open hostility to his probation officers in two different recorded prison calls").

In addition, the government must also prove that the defendant possessed the necessary mental state with respect to the threatening nature of the statement at issue. See Elonis v. United States, 575 U.S. 723, 135 S. Ct. 2001, 2012 (2015). While the precise contours of the mental state requirement—including, for example, whether recklessness would suffice—have not been defined by the Supreme Court, there "is no dispute that the mental state requirement in Section 875(c) is satisfied if the defendant transmits a communication for the purpose of issuing a threat, or with knowledge that the communication will be viewed as a threat." Id.; see also United States v. Jordan, 639 F. App'x 768, 769 (2d Cir. 2016) ("The [Elonis] Court did not specify the mens rea required under the statute, but made clear that a simple negligence standard was unconstitutional.").

A defendant's intent to issue a threat or knowledge that a communication will be viewed as a threat can be proven through circumstantial evidence. See, e.g., McFadden v. United States, 576 U.S. 186, 135 S. Ct. 2298, 2304 n.1 (2015) ("[W]ith most mens rea requirements, the Government can prove the requisite mental state through . . . circumstantial evidence."); Rosemond v. United States, 572 U.S. 65, 134 S. Ct. 1240, 1250 n.9 (2014) ("In any criminal case, after all, the factfinder can draw inferences about a defendant's intent based on all the facts and circumstances of a crime's commission."); United States v. Libous, 645 F. App'x 78, 81 (2d Cir. 2016) (finding of defendant's willfulness was "permissibly based on circumstantial evidence"). Hence, for example, evidence of a defendant's prior bad acts may be admitted to prove a defendant's mental state in the Section 875(c) context where it corroborates evidence that a defendant knew or believed that the recipient of a threat was herself aware of the prior bad acts. See, e.g., Sovie, 122 F.3d at 126.

B. Rule 403 of the Federal Rules of Evidence

Under Rule 403 of the Federal Rules of Evidence, the Court may exclude relevant evidence only if the probative value of the evidence is "substantially outweighed" by the danger of unfair prejudice. United States v. Zackson, 12 F.3d 1178, 1182 (2d Cir. 1993). Thus, the defendant must show that the prejudice "involves some adverse effect . . . beyond tending to prove the fact or issue that justified its admission into evidence." United States v. Gelzer, 50 F.3d 1133, 1139 (2d Cir. 1995) (internal quotation marks and citation omitted). Unfair prejudice means an "undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Old Chief v. United States, 519 U.S. 172, 180 (1997) (quoting Fed. R. Evid. 403 Advisory Comm. Note). Traditional examples of unfair prejudice include evidence that appeals to the jury's sympathies, evidence that arouses jurors' sense of horror, and evidence that provokes a jury's instinct to punish. See 2 J. Weinstein, M. Berger, & J. McLaughlin, Weinstein's Federal Evidence, § 403.04 [1]. Evidence is not unduly prejudicial when it is not "more inflammatory than the charged crime[s]." United States v. Livoti, 196 F.3d 322, 326 (2d Cir. 1999).

5

III. Discussion

Evidence of the defendant's prior convictions and his suspected involvement in the Old Timers Day shooting is admissible as direct evidence of the charged offense because it is "inextricably intertwined" with the evidence regarding his transmission of an interstate threat and is "necessary to complete the story of the crime on trial." United States v. Lyle, 919 F.3d 716, 736 (2d Cir. 2019) (quoting United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000)). In other words, it is not extrinsic evidence admissible only for a limited purpose such as proving motive, intent or identity under Federal Rule of Evidence 404(b). See United States v. Towne, 870 F.2d 880, 886 (2d Cir.), cert. denied, 490 U.S. 1101, 109 S. Ct. 2456, 104 L.Ed.2d 1010 (1989) (no limiting instruction required regarding evidence that defendant possessed a firearm on days other than the date specifically charged in the indictment because such evidence was inextricably intertwined or necessary to complete the story of the crime on trial). Moreover, such evidence provides critical context that is highly probative on the question of whether the defendant's statement to PO-1 constituted a "true threat," as well as the defendant's mental state, and the probative value of such evidence is not substantially outweighed by any unfair prejudice. See Fed. R. Evid. 403.

Accordingly, the government respectfully requests that the Court allow the government to introduce at trial evidence regarding the following: (1) the defendant's 2006 convictions for attempted murder and other violent felonies based on his firing of a gun during a dispute in front of a nightclub; (2) the defendant's 2014 conviction for knowingly making or possessing dangerous contraband in prison; and (3) the defendant's suspected involvement in the Old Timers Day shooting. For the reasons explained below, such evidence is relevant to key issues at trial and is properly admitted under Rule 403.

A. The Defendant's Convictions and Uncharged Acts Are Evidence that the Defendant's Statement Was a True Threat

An essential element of the government's case will be proving that the defendant's statement that he wanted to get "the hammer" and shoot a senior parole officer in the face was a true threat. In evaluating whether a statement is a true threat, the jury is entitled to hear evidence that will help it to assess "whether an ordinary, reasonable recipient who is familiar with the context of the [threat] would interpret it as a threat of injury." Sovie, 122 F.3d at 125 (citation omitted). Additionally, because the defendant is expected to argue that his statement was ambiguous because he phrased it in the past tense and did not know that the SPO and other parole officers were listening to the call, "the recipients' states of minds and their reactions" will be particularly significant in "remov[ing] ambiguity by shedding light upon the context[] of the alleged threat[]." Malik, 16 F.3d at 50.

Here, the context of the defendant's statement includes what the SPO and other parole officers knew or believed on January 27, 2020 about the defendant regarding his ability and willingness to carry out violence. The government anticipates that the SPO and other parole officers will testify at trial that they interpreted the defendant's statement to be a serious threat to do future harm to the SPO because they believed the defendant had been

6

involved in a mass shooting in which several people were injured, that the defendant had a shank in prison, and that the defendant was a potential suspect in the Old Timers Day shooting. See, e.g., United States v. Carter, Case No. 94-CR-628 (ACW), 1995 WL 480991, at *2 (N.D. Ill. Aug. 11, 1995) ("Evidence that the victim knew that the threatened conduct had been carried out before tends to show that it was reasonable to take the threat seriously."). The government's witnesses will also testify that they took immediate steps to locate the defendant out of concern that he may try to carry out his threat against the SPO. Those reactions, which are important to shed light on the context of the alleged threat, see Malik, 16 F.3d at 50, make sense only in light of the witnesses' knowledge of the defendant's prior violent acts.

Testimony regarding the defendant's suspected involvement in the Old Timers Day shooting in particular is also necessary to explain why the defendant was prohibited from entering the NYPD's 73rd Precinct, where that shooting occurred. It was the defendant's violation of that parole condition that, among other things, led the SPO to require the defendant to wear a GPS monitoring device. And it was the defendant's decision to cut that GPS device off and abscond that ultimately led parole officers to search for him, leading to the January 27, 2020 phone call in which the defendant threatened the SPO. There is therefore a direction connection between the defendant's association with the Old Timers Day shooting and his threat against the SPO, and evidence regarding the former is "necessary to complete the story of the crime on trial." Lyle, 919 F.3d at 736.

Separately, evidence tending to prove the facts of the defendant's other criminal acts is relevant because it would corroborate the witnesses' beliefs. See Sovie, 122 F.3d at 126. In Sovie, Mark Sovie had been convicted under Section 875(c) based on threats he made to his former girlfriend during certain interstate phone calls. On appeal, Sovie argued that trial testimony by two ex-wives about physical abuse they had suffered from Sovie was improperly admitted because it was not relevant to the pending charges. Id. However, the Second Circuit rejected this argument, noting that the former girlfriend's testimony that Sovie "had informed her of his abuse of his prior wives" tended to "prove two critical elements of the crime: first, that [the victim] reasonably perceived Sovie's phone calls as true threats . . . and, second, that Sovie intended to 'communicate a threat of injury.'" Id. (internal citations omitted). As such, the ex-wives' testimony "that such abuse actually occurred importantly corroborated [the victim's] testimony regarding what Sovie had told her about that abuse." Id. (emphasis added).

As described above, testimony by the SPO and other parole officers that they knew the defendant was previously convicted for a nightclub shooting and having a shank in prison, as well as suspected of being involved in the Old Timers Day shooting, would tend to prove that the defendant's January 27, 2020 statement was a true threat. Therefore, just as in Sovie, other evidence proving that the defendant was actually convicted of those crimes and involved in the Old Timers Day shooting would corroborate the witnesses' testimony regarding their knowledge. For example, evidence that the .40 caliber gun used in the Old Timers Day shooting was found a few days later just a few feet away from the apartment where the defendant resided would corroborate the witnesses' belief that the defendant was

7

involved in the shooting.  That belief is also made more credible by the defendant's discussion of the shooting during a jailhouse phone call, in which he called guns "hammers" and said "you already know how we play, nigga" in response to an inmate's comment that he had heard the defendant "did [his] thing too."  In other words, evidence that the defendant actually committed other criminal acts would be relevant to the issues at trial.  See, e.g., United States v. Gilan, 967 F.2d 776, 780 (2d Cir. 1992) (to introduce evidence regarding a defendant's involvement in another bad act that is relevant to the conduct charged at trial, "the Government must at least provide some evidence that the defendant committed the prior bad act") (citation omitted) (emphasis omitted).

> B. <u>The Defendant's Convictions and Statements Regarding Uncharged Acts Are Evidence of His State of Mind at the Time He Issued the Threat</u>

The defendant's prior convictions and certain of his statements relating to the Old Timers Day shooting also are evidence that the defendant either intended his statement to be a threat or knew that it would be received as a threat.  See Elonis, 135 S. Ct. at 2012; Sovie, 122 F.3d at 126; Xiang Li, 2016 WL 11082041, at *6 ("the context and content of these communications also confirm that they were intended to, and in fact did, frighten the victims").

The defendant's criminal history cannot be divorced from his mental state at the time he told PO-1 that he wanted to get "the hammer" and shoot the SPO in the face.  Just the day before, PO-1 had called the defendant, identified himself as a parole officer, and inquired about the defendant removing and destroying the GPS monitor installed by the SPO.  The defendant thus knew or should have known that PO-1 was aware of the defendant's criminal history through discussions with the SPO.  In other words, the defendant knew he was talking to a parole officer who knew of the defendant's past violent felonies and nevertheless (or perhaps accordingly) told the officer that he wanted to shoot the parole officer's colleague.  Evidence regarding the defendant's criminal history is thus directly relevant to whether the defendant intended or knew that his words would be received as a threat.  See Sovie, 122 F.3d at 126 (external evidence of prior bad acts is relevant to defendant's mental state where it corroborates evidence that defendant knew or believed recipient of threat was aware of prior bad acts).

Certain of the defendant's statements regarding the Old Timers Day shooting are also relevant to the defendant's mental state.  During the January 27, 2020 call with PO-1, the defendant said he wanted to shoot the SPO with "the hammer," not a "gun."  While the defendant's casual use of this slang term implies that he knew PO-1 would understand the reference, the defendant's previous usage of the term in other contexts would show that the defendant intended to communicate that he was talking about getting a gun.  In particular, during his July 28, 2019 phone call with a Rikers Island inmate and his August 9, 2019 NYPD interview, the defendant repeatedly referred to guns as "hammers" while discussing the Old Timers Day shooting.  Those statements lend important context to the January 27, 2020 phone call, and the government should be permitted to elicit such testimony at trial.

8

C. The Defendant's Convictions and Uncharged Acts Demonstrate the Defendant's Knowledge or Intent Under Rule 404(b)

As discussed above, evidence proving the defendant's criminal history and uncharged acts is directly relevant to establishing the elements of Section 875(c) and should be permitted as part of the government's case-in-chief. Alternatively, such evidence should be allowed under Rule 404(b) of the Federal Rules of Evidence, which provides that evidence of "other crimes, wrongs, or acts" cannot be admitted to prove propensity but may be admitted to prove "intent . . . [or] knowledge . . . ."

In the Rule 404(b) context, the Second Circuit follows "an inclusionary rule, allowing the admission of [other crimes, wrongs, or acts] evidence for any purpose other than to show a defendant's criminal propensity, as long as the evidence is relevant and satisfies the probative-prejudice balancing test of Rule 403 of the Federal Rules of Evidence." Carboni, 204 F.3d at 44 (citation omitted). "The district court has wide discretion in making this determination" and will be reversed only for abuse of discretion." Id.

Because the defendant's intent or knowledge is an essential element of the charge and will be vigorously contested at trial, "evidence of prior similar acts may be introduced to prove that intent." United States v. Caputo, 808 F.2d 963, 968 (2d Cir. 1987); see also Zackson, 12 F.3d at 1182 ("Where a defendant claims that his conduct has an innocent explanation, prior act evidence is generally admissible to prove that the defendant acted with the state of mind necessary to commit the offense charged.") (citation omitted). For the reasons discussed earlier, evidence that the defendant was convicted of attempted murder after committing a nightclub shooting, had a shank in prison, was present at the Old Timers Day shooting, and referred to guns as "hammers" in the context of the Old Timers Day shooting shows that the defendant intended to threaten the SPO. Introduction of such evidence would therefore be appropriate under Rule 404(b).

D. The Probative Value of the Defendant's Convictions and Uncharged Acts Is Not Substantially Outweighed by Unfair Prejudice

Evidence regarding the defendant's criminal history and suspected involvement in the Old Timers Day shooting is highly probative of whether the defendant made a true threat and his mental state. This is especially so because the defendant used slang and referred to getting a gun and shooting the SPO in the past tense, and the need for context is greater where a statement is ambiguous. See Turner, 720 F.3d at 422 (courts should not be rigid in adhering to the literal meaning of a communication "without regard to its reasonable connotations derived from its ambience") (citation omitted); Malik, 16 F.3d at 50 (recipients' states of mind and reactions are particularly significant in removing ambiguity "by shedding light upon the contexts of the alleged threats"); Carter, 1995 WL 480991, at *4 (noting that there is a stronger need to introduce evidence of a defendant's other "bad acts" where a threatening statement is ambiguous because in that case, "the need for prior acts of violence is great so the jury can understand what the victim understood the statement to mean").

By contrast, any unfair prejudice posed by such evidence would not substantially outweigh its probative value. See Fed R. Evid. 403; Livoti, 196 F.3d at 326 (evidence is not unduly prejudicial when it is not "more inflammatory than the charged crime"). While the defendant's prior conviction for attempted murder and other violent felonies arises from heinous conduct by the defendant, the government intends to introduce only enough evidence to show that the defendant was in fact convicted of those crimes based on a nightclub shooting. Because the government would not present evidence regarding details such as the circumstances leading up to the shooting or the impact on victims, there is little risk that the evidence would inflame the jury's passions. Likewise, the government will introduce only enough evidence to prove that the defendant was convicted for having a shank in prison and not inquire into any of the underlying details of that crime. When balanced against the nature of the charged crime—threatening to shoot and kill a senior parole officer—such generalized evidence regarding the defendant's past convictions would not be substantially outweighed by any unfair prejudice.

The fact that the defendant's prior convictions occurred 14 and 6 years ago, respectively, does not change the Rule 403 balance in this case. While the remoteness of a prior conviction affects its probative value, see United States v. Figueroa, 618 F.2d 934, 942 (2d Cir. 1980), evidence of such a conviction "may be admitted, notwithstanding a relatively longer passage of time since the commission of the prior act," when it is adequately probative. United States v. Ozsusamlar, 428 F. Supp. 2d 161, 171 (S.D.N.Y. 2006) (citing United States v. Martino, 759 F.2d 998, 1005 (2d Cir. 1985)). As discussed above, the defendant's prior convictions are directly relevant to whether there was a true threat and the defendant's mental state. Indeed, the defendant's term of parole supervision was imposed as part of his sentence for the 2006 conviction, and the remoteness of that conviction is simply a function of his being sentenced to 14 years of incarceration. The passage of time has therefore not materially affected the probative nature of the convictions evidence.

As to the defendant's suspected involvement in the Old Timers Day shooting, the government does not intend to conduct detailed inquiries into the underlying investigation. Instead, the government would offer one law enforcement witness for the limited purpose of explaining the evidence that led the NYPD to believe the defendant was involved in the shooting—i.e., the defendant's statements placing him at the scene with Jason Pagan (during his NYPD interview and on the recorded jail call), the discovery just outside of the defendant's residence of a .40 caliber handgun used in the shooting, and a bystander's identification of the defendant in a photo array. Otherwise, the focus of the government's inquiry will be on how the defendant's status as a suspect led to the imposition of a geographic restriction and informed parole officers' interpretation of the defendant's January 27, 2020 statements, which are facts needed to "complete the story of the crime on trial." Lyle, 919 F.3d at 736

Finally, to the extent the Court concludes it is necessary, appropriate instructions to the jury limiting the use of evidence regarding the defendant's prior convictions or other bad acts only to issues such as evaluating witness credibility or the defendant's mental state would mitigate any possible unfair prejudice. See United States v.

10

Mercado, 573 F.3d 138, 141-42 (2d Cir. 2009) (allowing government to introduce evidence regarding defendant's prior gun sales to co-conspirator in narcotics distribution trial was not an abuse of discretion where such evidence was accompanied by instruction limiting use of evidence to Rule 404(b) grounds such as intent and knowledge); United States v. Bermudez, 529 F.3d 158, 162-63 (2d Cir. 2008) (allowing government to introduce evidence regarding drug-related statements made by defendant in gun possession trial was not an abuse of discretion where such evidence was accompanied by instruction limiting use of such evidence to evaluating witness credibility); United States v. Downing, 297 F.3d 52, 59 (2d Cir. 2002) ("Absent evidence to the contrary, we must presume that juries understand and abide by a district court's limiting instructions.").

IV. Conclusion

For the reasons set forth above, the government respectfully requests that it be allowed to introduce evidence at trial regarding the defendant's past convictions and suspected involvement in the Old Timers Day shooting.

Respectfully submitted,

SETH D. DuCHARME
Acting United States Attorney

By:  /s/ Andrew Wang
Andrew D. Wang
Assistant U.S. Attorney
(718) 254-6311

cc: Clerk of Court (RPK) (ECF)
Defense counsel (Email)

11