# MEHLER LAW PLLC
747 Third Avenue ♦ 32nd Floor ♦ New York, NY 10017-2803

November 17, 2020

**By ECF**
The Honorable Rachel P. Kovner
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 1201

                  Re: *United States v. Keith Levy* **20-CR-87 (RPK)**

Dear Judge Kovner:

      We write in response to the government's motion *in limine*. *See* ECF No. 37, Motion in Limine by USA ("Govt. Mot."). In its motion the government seeks rulings from the Court permitting the government to introduce at trial Keith Levy's two prior convictions, including: (1) a conviction for attempted murder and related felony charges based on conduct that allegedly occurred more than 15 years ago when Mr. Levy was 17; and (2) a 2014 conviction for possessing prison contraband (a shank very likely obtained as protection from predatory prisoners). It also seeks to introduce (3) rank hearsay and hunches about a current investigation into shootings at the "Old Timers Day" event in Brooklyn on July 27, 2019. Govt. Mot. at 6.

      The government has charged Mr. Levy with a single count of Transmission of Threat to Injure in violation of 18 U.S.C. § 875(c). The indictment alleges that on or about January 27, 2020 Mr. Levy "did knowingly and intentionally transmit in interstate commerce a communication containing a threat to injure the person of another, to wit: a communication threatening the life of, and threatening bodily injury to, Jane Doe, an individual whose identity is known to the Grand Jury." *See* ECF No. 7, Indictment. More specifically, the government alleges that, while Mr. Levy was in Atlanta, (we will argue he was agitated and staying with a relative there in order to get away and decompress) he made a single, one-sentence, indirect "threat" over the phone to a third party parole officer allegedly directed to another senior parole officer ("SPO"). One would think someone with an intent to threaten would call the person he desired to threaten. But here Parole called Mr. Levy, not the other way around, and Mr. Levy never even spoke to the SPO he was allegedly threatening.

      Even the substance of the communication is disputed. The government alleges now that this one brief, isolated and, we will argue, frustrated outburst indicated "in sum and substance, that [Mr. Levy] wanted to get 'the hammer' and shoot the SPO in the face." Govt. Mot. at 3.

The Honorable Rachel P. Kovner
November 16, 2020
Page 2

Meanwhile, the complaint sworn to by the federal case agent alleges merely that Mr. Levy conveyed to the third party parole officer that he wanted to "punch" the SPO (ECF Dkt No. 1 at 9)—a parole officer who, we will also claim, was being relentlessly nasty and abusive, not even allowing Mr. Levy to visit the precinct where his mother lives, and seemingly reveling in the power she had to humiliate him.

### A. Case Background and Overview

The government's motion *in limine* is an audacious attempt to admit ancient and deeply inflammatory prior convictions, as well as bald conjecture about an ongoing investigation, all in the service of securing an unfair conviction in an otherwise highly questionable interstate threat case now set for trial before this Court on December 14, 2020.

It is an elementary principle of criminal justice that a defendant must be judged based on the crime for which he has been charged, <u>not</u> on an illegitimate inference of acting in conformance with a character trait, known as *inadmissible propensity evidence*. *See* Fed. R. Evid. 404 (b). Although, the government's motion is gussied up with serpentine logic and extensive citation, the argument at its core is: Mr. Levy intended to make a "true threat" because he is an incorrigibly violent young man who is a suspect in a mass-shooting at the Old Timers Day event and happens to hail from a dangerous part of Brooklyn. To be frank, if the government's motion *in limine* is granted, the prosecutor can simply stand and say to the jury: "Past is prologue ladies and gentlemen, so convict Mr. Levy." He can then sit back down, and a blatantly unfair guilty verdict would all but be guaranteed.

In fact, as the defense pointed out in an extensive early overview of the case last spring, there was the suspicion even then that this weak threat case always had an ulterior motive: "Some task force or other law enforcement agency was trying to put pressure on [Mr. Levy], even if he did not have the information [about Old Timers' Day] they wanted." ECF Dkt No. 37 at 3.
This ulterior motive is now all but confessed to in the government's current brief. State Parole authorities were not eager to press the threat case. Govt. Mot. at 3. Why would they when it must have been obvious to them that the import of Mr. Levy's impulsive statement was without the guile or malice of a true threat? So, they dismissed the charge "with prejudice" and allowed Mr. Levy to plead to, in effect, insubordinate conduct vis a vis his Parole officer, albeit one that has severely cost him another whole year of his life. *See* Exhibit A, attached hereto, 6/12/20 Parole Hearing transcript. Under these conditions, and without the verboten propensity evidence, the Court might well decide to dismiss the case under Fed. R. Crim. P. 29 and not even let it go to the jury.

In effect, the government is asking this Court, a jury, Court personnel and the defense to endure the inconvenience of a trial (it may take multiple days to even pick a jury in light of

Covid-19 protocols) and even health risks to support the erroneous whims and blunt-edged tactics at play here. Seemingly impatient with the time-consuming "shoe leather" needed to solve this crime, the law enforcement prayer here is that, by squeezing Mr. Levy through this misbegotten prosecution, they will finally crack the Old Timers Day case at long last. The hope is that the highly objectionable evidence at issue here under Fed. R. Evid. 404(b) may finally allow the authorities to harness Mr. Levy to this cause. He is their quarry, but also a pawn in their larger chess match.

The Parole authorities first tried to jam up Mr. Levy themselves by imposing an arguably unconstitutional ban on visiting the 73 Precinct where his mother lives. When he was caught near his mother's apartment, they sought to violate his Parole, but the administrative law judge was unimpressed and lifted Mr. Levy's Parole warrant. So the authorities quickly went after him again, and one Parole officer even obliquely admitted to Mr. Levy that others were driving the effort to restrict his movement away from his mother's residence, which this time caused his resentment and frustration to escalate.

Finally, this case background and overview would be incomplete without another anchoring cluster of facts. From the age of 12 Mr. Levy was subject to tantrums and emotional overload. He was even hospitalized as a child for months at Four Winds Hospital in Katonah, New York as a result. Throughout his adult life Mr. Levy has battled depression, anxiety and other issues with intermittent mental health treatment. He currently takes three separate relevant medications.

Given Mr. Levy's mental health struggles, it is entirely likely that, absent the totally inappropriate Rule 404(b) evidence, any jury will acquit Mr. Levy, just as the defendant in the last Eastern District threat trial was acquitted. *See United States v. Segui*, No. 19-cr-188 (KAM), 2019 WL 8587291 (E.D.N.Y. December 2, 2019). There, an unhappy and frustrated former student threatened to travel to Michigan to cut off his former professor's fingers and then kill him. He purchased a hatchet on Amazon, and was arrested as he was about to board a bus to Michigan. The actual hatchet and packaging addressed to Segui were recovered in a search. He admitted to arresting officers that he was traveling to kill his professor. Despite this much stronger case than that of Mr. Levy, Mr. Segui was understandably acquitted after trial, no doubt because the jury felt the defendant needed treatment, not prison.

Mr. Levy needed mental health treatment too when he was released from prison. He never got that treatment due to complications with Medicaid coverage and utter and complete indifference (even apart from meanness) by Parole authorities. He got a job at FedEx and tried to reintegrate, but apparently, he never had a real chance. Now he will soon be in the tenth month of a sentence essentially for failing to follow Parole directions. He is set to do another 11 or 12 weeks of prison time, and that is more than enough. He needs to get back to work, take his medication and stay out of trouble. If Mr. Levy was somehow involved with the tragedy of Old Timers Day shooting in Brownsville, let the authorities indict him. If he shot someone, charge

The Honorable Rachel P. Kovner
November 16, 2020
Page 4

him with the shooting. If he had a gun, charge him with a gun offense. If he was otherwise involved, even at the periphery, charge him with conspiracy. They won't because they can't, and taking up the time of this Court and lots of others, they believe, is their best alternative. But to co-opt this Court to engineer an automatic conviction by introducing inappropriate Rule 404(b) evidence at trial where the unfair prejudice far outweighs the probative value would be plainly unjust.

### B.     Elements of 18 U.S.C. § 875(c)

For a conviction to hold under 18 U.S.C. § 875(c) the government must persuade a jury first that the interstate communication was objectively a "true threat", and second, that the defendant subjectively possessed the requisite *mens rea* with respect to sending the alleged threat. *Elonis v. United States*, 135 S.Ct. 2001, 2012 (2015).

As to the first element, the Second Circuit employs an objective test in determining whether a § 875(c) "true threat" was made. *United States v. Turner*, 720 F.3d 411, 420 (2d Cir. 2013). More exactly, under this objective standard the government must prove "that the circumstances were such that an ordinary, reasonable recipient familiar with the context of the communication would interpret it as a true threat of injury." *United States v. Francis,* 164 F.3d 120 (2d Cir. 1999); *see also Turner* 720 F.3d at 420; *United States v. Davila* 461 F.3d 298, 305 (2d Cir. 2006).

The *Elonis* Court added an additional subjective component under § 875(c), holding "that the mental state requirement in [18 U.S.C. § 875(c)] is satisfied if the defendant transmits a communication *for the purpose of issuing a threat*, or *with knowledge that the communication will be viewed as a threat.*" *Elonis v. United States*, 135 S.Ct. 2001, 2012 (2015) (emphasis added). "Indeed, the Supreme Court in *Elonis* held that a conviction under 18 U.S.C. § 875(c) requires more than proof 'that a reasonable person would regard [the] communications as threats.'" *United States v. Choudry*, 649 F. App'x 60, 62 (2d Cir. 2016) (summary order) (citing *Elonis 135 S. Ct. at 2012). See also Austin v. United States*, 280 F. Supp. 567, 577 (S.D.N.Y. 2017) ("[the *Elonis* court] rejected a negligence standard for the interstate transmission of communications containing threats to injure other people"). As a consequence, the government must prove that Mr. Levy possessed the requisite mental state in that he intended for the communication to be perceived as threatening.

### C.     Uncharged Acts are "Extrinsic Evidence" Subject to Federal Rule of Evidence 404(b)

The government contends that Mr. Levy's two prior convictions and investigatory details concerning the Old Timers Day shootings are direct evidence that is "inextricably intertwined" and therefore not subject to Federal Rule of Evidence 404(b) analysis. *See* Govt. Mot. at 6. That argument holds little water.

The Honorable Rachel P. Kovner
November 16, 2020
Page 5

Evidence of uncharged criminal activity is direct evidence "when it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000). Uncharged criminal conduct is not "inextricably intertwined" with the charged conduct simply because it "provides context or is relevant" to the charged conduct. *United States v. Johnson,* No. 16-CR-281 (PGG), 2019 WL 690338, (S.D.N.Y. Feb. 16, 2019) (internal citations omitted). Accordingly, courts in the Second Circuit conduct Rule 404(b) analysis of uncharged criminal conduct that "merely provided context or was somehow relevant to the charged conduct." *Id. (quoting United States v. Kassir,* No. 04-CR-356 (JFK), 2009 WL 976821 (S.D.N.Y. April 9, 2009). "*[W]here it is not manifestly clear that the evidence in question is intrinsic proof of the charged crime*" courts should proceed with Rule 404(b) analysis of the uncharged criminal conduct. *United States v. Herron*, No. 10-CR-0615 (NGG) 2014 WL 1894313 (E.D.N.Y. May 12, 2014) (emphasis added) (*citing United States v. Townsend*, 06-CR-34 (JFK) 2007 WL 1288597, (S.D.N.Y. May 1, 2007).

In this case, the government seeks to admit two criminal convictions that temporally reach back to 2006 and 2014. The facts of both convictions are completely divorced from the alleged crime charged in this indictment. It cannot plausibly be argued that these hoary convictions are "inextricably intertwined" with one utterance made in the course of a telephone conversation from January 27, 2020 that was not even initiated by Mr. Levy. Similarly, details of the Old Timers Day shootings from July 27, 2019 are not direct evidence of the charged crime that took place months later, and the two events are in every way factually unconnected. As a consequence, since the three uncharged events are not "manifestly" intrinsic proof of the charged crime, this Court should proceed with a Rule 404(b) analysis.

Even if this Court finds the two prior convictions and the Old Timers Day evidence somehow to be "direct evidence," the discussion below in the context of Rule 404(b) applies with equal force, given that it pertains to whether this evidence is relevant under Fed. R. Evid. 401 and not unfairly prejudicial under Fed. R. Evid. Rule 403.

**D.     The Court Should Exclude the Government's "Other Act" Evidence**

Under Federal Rule of Evidence 404(b), "[e]vidence of other acts is not admissible to prove that the actor had a certain character trait, in order to show that on a particular occasion he acted in conformity with that trait." *Hynes v. Coughlin*, 79 F.3d 284, 2090 (2d Cir. 1996).

When ruling on the admissibility of Rule 404(b) evidence, the Court must "consider whether (1) the evidence is "offered for a proper purpose;" (2) the evidence is relevant to a disputed issue; (3) the probative value of the evidence is substantially outweighed by its potential for unfair prejudice pursuant to Rule 403; and (4) the court must administer "an appropriate limiting instruction." *United States v. McCallum*, 584 F.3d 471, 475 (2d Cir. 2009) (prior

The Honorable Rachel P. Kovner
November 16, 2020
Page 6

convictions were impermissibly admitted to show propensity without "regard for the unfair prejudice that surely would result from their admission"; *citing Huddleston v. United States*, 485 U.S. 681, 691-92 (1988))

**1. "Proper Purpose" and Relevance:**

"Other acts" evidence may be admitted only if offered for a proper purpose under the rule, and is relevant to a material issue that is in dispute at trial. *See Huddleston,* 485 U.S. at 691-92; *United States v. DeVaughn*, 601 F.2d 42, 45 (2d Cir. 1979); *United States v. O'Connor*, 580 F.2d 38, 40 (2d Cir. 1978). "Other acts" evidence is not presumed to be relevant or necessary. *Id.* Rather, the government bears the burden of demonstrating relevance and "actual need" for the evidence prior to its admission. *United States v. Manafzadeh*, 592 F.2d 81 (2d Cir. 1979).

Rule 404(b) aims to protect a defendant against the risk that he will be convicted simply for possessing a bad record or having a bad character. As the Supreme Court has long emphasized, character evidence is excluded precisely because the issue of character "weigh[s] too much with the jury" and "over persuades them so as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge." *Michelson v. United States*, 335 U.S. 469, 475-76 (1948); *see also United States v. Queen*, 132 F.3d 991, 996 (4th Cir. 1997). Rule 404(b) also prevents the defendant from "facing at trial the near impossible task of defending himself against 'prior acts from the span of one's entire lifetime' rather than the acts alleged in the indictment." *United States v. Lentz*, 282 F.Supp.2d 399 (E.D. Va. 2002) (quoting *Queen*, 132 F.3d at 996).

The government must identify the "connection between the act at issue and an element of the charged crime." *United States v. Paulino*, 445 F.3d 211, 223 (2d. Cir. 2006). (internal citation omitted). Where the government offers uncharged crimes evidence to establish knowledge or intent, the government must "identify a similarity of connection between the two acts that make the prior act relevant to establish knowledge of [or intent to commit] the current act." *United States v. Garcia*, 291 F.3d 127, 137 (2d Cir. 2002).

The government argues that Mr. Levy's juvenile crime committed more than 15 years ago, where Mr. Levy was convicted of allegedly shooting at someone in a nightclub who previously shot him and, in the process, wounded others should come into evidence. Govt. Mot. at 7. The government argues, somewhat ridiculously, that this is no more inflammatory than Mr. Levy's alleged statement that he sometimes felt so upset with a mean or abusive Parole officer the he felt like punching (in other versions—shooting) her. ECF Dkt No. 1 at 9. If the government genuinely wishes to argue these two scenarios are equal on a potential prejudice scale, why even make an opening statement? The Court can simply allow the prosecution to "wave the bloody shirt" (a common refrain to chastise politicians who turned to histrionics to score electoral victories) of this 2006 conviction and wait for a conviction to ensue.

The Honorable Rachel P. Kovner
November 16, 2020
Page 7

      The government further argues that because the defendant nearly a decade ago possessed, but never used, a primitive "shank" (for his own protection) while in an upstate prison with predatory inmates, that stale fact should be admitted into evidence to help prove that a brief, solitary, frustrated utterance to a third party was a genuine threat. Gov. Mot. at 7. The basis for admissibility, claims the government, is that the two are "inextricably intertwined," *Id.* at 9, like a hoop and a hook shot in a basketball game, like mozzarella and tomato sauce on a pizza. This too is self-evidently ludicrous.

      Finally, and perhaps most outlandishly, the government wishes to make Mr. Levy defend himself without due process in an investigation into the Old Timers Day shootings that is now in its second year. Govt. Mot. at 10. The government wants to elicit testimony that Parole officers knew the data points that certain law enforcement officers believe tie Mr. Levy to shootings at a celebration last year in Ocean Hill – Brownsville. *Id.* A law enforcement officer plans to testify to a hearsay identification of Mr. Levy at the celebration and scene of the shootings, even though Mr. Levy has admitted he and hundreds of others were there and, thus, this proves nothing. *Id.* The officer will also testify that a gun of the same caliber used in the shootings was found in the stairwell of a public housing project where Mr. Levy's mother lives, though inconveniently someone else's DNA was found on that gun. *Id.* It's unknown to us whether even that person has been indicted.

      The clear innuendo is that Mr. Levy was involved in the shootings, even though he has not been charged with attempted murder, conspiracy or even a gun offense. Moreover, the government's submission is woefully insufficient in that it does not particularize at all who will testify to what and the basis for each person's knowledge. (We will discuss this point in greater detail later in this submission.) But if propensity evidence is what the government is after, the proposed Old Timers Day testimony will do the job, though The Second Circuit would surely consider it an abuse of discretion for the Court to allow the admission of such speculative and prejudicial, seemingly hearsay, evidence.

      Here the government proffers that the above evidence helps give context for how the SPO interpreted Mr. Levy's comment, even though the comment was not even made to her. Govt. Mot. at 7-8. Given that the other acts evidence occurred long before the charged crime, it defies logic to contend that this evidence is relevant to "complete the story of the crime on trial" or to provide background. Id. at 6. Quite the contrary, the government could quite easily and coherently tell the story of Mr. Levy's grievances and his frustration while on parole that lead up to his one telephone call. And, by the way, talk about an unplanned burst of frustration that negates *mens rea*. Mr. Levy did not even call the third party. The third party called him to get him to return from Atlanta! Mr. Levy only had seconds, if that, to form a criminal intent about one person while talking to another.

The Honorable Rachel P. Kovner
November 16, 2020
Page 8

The very first 1972 advisory committee notes to Rule 404 (b) point out that the Court should consider any proffered evidence "in view of the availability of other means of proof [.]" Fed. R. Evid. 404 (b) Advisory Committee note. At trial the government could easily describe in detail at trial the actions Mr. Levy took leading up and until the disputed comment, including: friction with the condescending SPO, the geographic restrictions placed upon him, cutting off his ankle bracelet and getting away from Parole to reduce his stress in Georgia. Id. at 3. All of those facts would assist the jury in deciphering whether his communication was a "true threat."

The government can do even more. It can elicit whether Mr. Levy ever glowered at the SPO. Did he ever raise his hand toward her? Did he make his fingers into a trigger and point them at her? Did he stalk the SPO? Did he make dozens of phone calls to her with ominous language? Did he raise his voice? (We know she raised her voice.) Did he insult her? (We know she insulted him.) These are all "other means of proof" contemplated by Rule 404(b).

On the other hand, if the government seeks to confuse the jury, flood the trial with unfair prejudice, and steer this Court onto the shoals of reversible error, these three items of Rule 404(b) evidence surely will achieve these results.

The government further contends that the above evidence is relevant to show the defendant's intent when he made the alleged threat. Govt. Mot. at 9. It strains credulity to understand how convictions that date back to so long ago inform Mr. Levy's state of mind. How can he be the same as when he was a teenager, allegedly looking for revenge against someone who had shot him? Likewise, it's entirely unclear how Mr. Levy's alleged involvement in the Old Timers Day events is relevant to establish his *mens rea* when he made the alleged telephone threat.[1] Accordingly, the government has failed to identify any connection between the uncharged crimes and their relevance to establish Mr. Levy's intent to send a threat. *See Garcia* 291 F.3d at 138 (government failed to establish connection that prior conviction "was meaningfully probative of [defendant's] knowledge"); *McCallum* 584 F.3d at 478 (same).

### 2. Probative Value is Substantially Outweighed by Unfair Prejudice

None of the three proffered "other acts" here have more than even slight probative value, as explained above. But even if they did, other acts evidence also must meet Rule 403's balancing test in order to be admissible. *See, e.g.*, *United States v. Myerson*, 18 F.3d 153, 166 (2d Cir. 1994) ("Relevant evidence of a defendant's prior bad acts [may be] admissible under Rule 404(b) . . . so long as that evidence is not substantially more prejudicial than probative under Rule 403.") (internal citation and quotation marks omitted).

---

[1] The contention that Mr. Levy referring to a "hammer" instead of a "gun" in a prior recording is relevant to his use of that phrase in the charged threatening statement is also unavailing. Govt. Mot. at 9. The phrase "hammer" is an all too common slang phrase used to refer to a gun, and the defense is certainly not disputing its colloquial meaning, only its import here.

The Honorable Rachel P. Kovner
November 16, 2020
Page 9

      Of paramount concern is assessing whether the proffered evidence involves conduct more sensational or disturbing than the charged crime. *United States v. Lyle*, 919 F.2d 716, 737 (2d Cir. 2019). "The probative value of prior bad-act evidence is not substantially outweighed by the risk of prejudice if the other conduct is not 'any more sensational or disturbing' than the charged crime." *United States v. Rosemond*, 958 F.3d 111,125 (2d Cir. 2020). In *Rosemond*, the district court properly admitted Rule 404(b) evidence where defendant was charged with "murder-for-hire," which was "far more sensational and disturbing" than the prior bad act. *Id*. at 126.

      Courts in this Circuit have drawn similar conclusions when the prior acts did <u>not</u> involve "more sensational or disturbing" conduct than the charged offense. *See, Lyle* 919 F.3d at 736-7 (prior drug offense properly admitted when charged offense involved drugs); *United States v. Giovinco*, 382 F. Supp.3d 299 (S.D.N.Y. 2019) (prior enterprise corruption conviction admitted when charged crime involved racketeering conspiracy); *United States v. Torres*, No. 16-CR-809(VM) 2020 WL 373981(S.D.N.Y. Jan. 23, 2020) (prior offenses admitted where defendants charged with conspiracy to murder). Consider as well the following cases where the prior acts were found to be more serious and graphic than the charged crime. *See United States v. Al-Moayad*, 545 F.3d 139, 161 (2d Cir. 2008) (in prosecution for conspiracy to provide financial support to terrorists, improper to admit evidence concerning a violent suicide bombing); *United States v. Grimes*, 244 F.3d 375, 385 (5th Cir. 2001) (in child pornography case, error to admit written narratives describing torture and rape when charged pictures were non-violent); United States v. Gilbert*, 229 F.3d 15, 21-25 (1st Cir. 2000) (in capital murder prosecution of nurse for killing patients, affirming decision to keep out allegations of attempted murder of her husband due to severe prejudice); *Berry v. Oswalt*,143 F.3d 1127, 1131-33 (8th Cir. 1998) (reversible error to admit inflammatory sexual misconduct evidence in rape case because it was too dissimilar); *United States v. Midyett*, 603 F. Supp. 2d 450, 456 (E.D.N.Y. 2009) (excluding evidence of an alleged assault in prosecution for drug possession and distribution).

      The above concerns are particularly implicated in this case where the charged crime involves one isolated and variously reported alleged threat and the proffered evidence involves particularly violent behavior. Most especially prejudicial is the 2006 conviction where several people were shot and the Old Timers Day shooting where 12 people were shot. Illustrative of the damning nature of this proffered evidence is that, after the government filed its motion *in limine,* the Daily News wrote an article touting Mr. Levy's alleged connection to the Old Timers Day events in 2019.[2] Prior to the filing of that motion this case understandably did not pique the interest of the media, but once Mr. Levy was said to be somehow connected to, or in the know about, a highly dramatic mass shooting, suddenly the case is newsworthy.

      Indeed, the government describes Mr. Levy's prior acts as involving "a mass shooting" and "other violent felonies [that] arise from heinous conduct by the defendant." Govt. Mot. at 7,

---

[2] *See* Noah Goldberg, "Man who threatened to shoot parole officer is suspect in 2019 mass shooting at Old Timers Day festival in Brownsville: feds", New York Daily News, Oct. 26, 2020.

The Honorable Rachel P. Kovner
November 16, 2020
Page 10

10. The government shows its true intent here as its hope is that the jury will also view Mr. Levy as a "heinous" person; indeed it is abundantly clear that a jury would likely conclude that if Mr. Levy were involved in two separate shootings with over 15 total victims he most assuredly must possess the requisite intent to communicate a true threat to SPO Jane Doe.

This is propensity evidence on steroids, and it is not a close question. Evidence that Mr. Levy was convicted of a attempted murder for shooting several people in 2005, and then he was somehow "involved" in a sensational mass shooting with 12 victims at the Old Timers Day event in 2019, is infinitely more disturbing than the charged conduct of making one brief statement to a third party over a telephone, with no evidence proffered of anything that came before or after. If a jury tasked with deciding whether the government had proven an intentional threat of injury were to hear that profoundly more disturbing evidence, the danger that a jury would unfairly convict him on that basis cannot be overstated.

Under these circumstances, to maintain the fairness of the trial and ensure that it is decided based upon the evidence of the alleged conduct at issue, the Court should exercise its discretion to exclude the proffered three "other acts."

In addition, as is also briefly discussed above, probative value of "other act" evidence depends in significant part on how much time has passed between the earlier act and the charged conduct. *See United States v. Corey*, 566 F.2d 429, 432 (2d Cir. 1977) ("'In appraising the probative worth of the offered evidence . . . the distance in time of the facts offered will often cause the court to discount its value.'"). The passage of time makes the allegations regarding the other acts less reliable and more difficult for a defendant to rebut. Remoteness also undermines the value of earlier acts because even if the defendant engaged in an act or acts, he may have changed in the intervening years, making the earlier acts less probative of his intent at the relevant time. *See United States v. Carter*, 516 F.2d 431, 435 & n. 3 (5th Cir. 1975).

Given these concerns, courts have often excluded evidence of acts that allegedly occurred more than ten years before the charged conduct. *See Garcia*, 291 F.3d at 138 (excluding prior act evidence of a twelve year old conviction and recognizing that "the length of time between the events . . . detract from any potential probative value of the prior conviction"); *United States v. Gonzalez*, 2009 WL 1834317, *2-3 (S.D.N.Y. June 24, 2009) (excluding prior convictions of one defendant that were "thirteen to eighteen years" earlier, and of another defendant that were thirteen years earlier, than the charged conduct ); *United States v. Griggs*, 2004 WL 2676474 (S.D.N.Y. 2004) (17-year-old conviction for possession of bullets was inadmissible because the probative value of the evidence was greatly diminished by the passage of time and was thus outweighed by the potential for unfair prejudice). Indeed, the dangers of admitting evidence of acts that occurred ten or more years ago is reflected in the rule that generally even actual convictions—convictions that are documented in court records—may be used to impeach a witness's credibility only if they occurred within the previous ten years. *Corey*, 566 F.2d at 432 (citing Fed. R. Evid. 609(b)). *See also Robinson v. Troyan*, 2011 WL 5416324, *4 (E.D.N.Y.

2011) ("The Second Circuit has recognized that Congress intended that convictions more than ten years old be admitted 'very rarely and only in exceptional circumstances.'").

Here, the underlying events of Mr. Levy's two criminal convictions occurred respectively fifteen and eight years (or almost a decade) before the charged conduct and therefore substantially diminishes their probative force, leaving a jury much more likely to treat his two convictions as mere propensity evidence. The probative value is further diminished by the sweep of events in the intervening years. When the first conviction occurred, Mr. Levy was a 17-year-old, and he was only 25 when he got his second conviction. Today, of course, he is a 33-year-old grown man. The impact of life-changing events and the responsibilities they imposed make any attempt to connect either of his convictions to his state of mind regarding the charged crime not just tenuous but downright speculative. This would apply with equal force as to how the intended target of Mr. Levy's alleged threat interpreted that treat. *See Carter*, 516 F.2d at 435 (prior acts committed at an early age have little probative value because they reflect "immature judgment"); *cf. United States v. Blake*, 89 F. Supp. 2d 328, 341, 347 (E.D.N.Y. 2000) (Weinstein, J.) (because "behavior . . . is mutable," the "ties of community and an understanding of the responsibilities of family can help integrate [a person] into a healthy respect for the law and an understanding of the responsibilities of adulthood").

Indeed, the alleged so-called "shank" incident well into Mr. Levy's term of imprisonment may signify only this: that in spending a long time in prison with violent individuals, Mr. Levy justifiably grew afraid for his own safety. It bears as much significance to this case as owning a gun in a war zone. Without any probative connection between Mr. Levy's prior convictions and the current case, the jury will be left to conclude that his two prior convictions demonstrate that Mr. Levy is an incorrigibly violent and dangerous young man from a dark corner of Brooklyn. Elementary fairness dictates that the Court should exclude these two very old convictions.

As to the Old Timers Day evidence, apart from its amorphousness (no careful showing of who will testify to what and the basis of that person's non-hearsay knowledge), a point of final concern is that Mr. Levy will likely be forced to defend himself against those allegations without any due process, and no ability to confront his accusers. As the government correctly points out, when it tries to introduce evidence of a prior bad act, it "must at least provide some evidence that the defendant committed the prior bad act." *United States v. Gilan*, 967 F.2d 776, 780 (2d. Cir. 1992). In fact, the government takes that standard a step further and contends that "evidence that the defendant actually committed other criminal acts would be relevant to the issues at trial." Govt. Mot. at 8. To that end, the government intends to present the following evidence regarding the Old Timers Day shooting: hearsay testimony from a law enforcement officer, a purported inculpatory audio recording of the defendant and evidence that a gun was recovered near his mother's apartment. This is deeply troubling, as it puts the defense in the untenable position of cross-examining a law enforcement officer about blind allegations and unknown accusers in clear violation of the Sixth Amendment.

The Honorable Rachel P. Kovner
November 16, 2020
Page 12

      The Old Timers Day evidence will also no doubt confuse the jury and encumber the Court with conducting a "trial within trial," as the defense is forced to rebut this evidence and perform extensive voir dire at a minimum, with jury confusion, delay and irritation sure to follow, simply to test the knowledge basis of each witness.  And this proffered evidence is so incendiary anyway that it will make it all but impossible for Mr. Levy to have a fair trial.  The Court should exclude all evidence of the Old Timers Day shootings.

**E.**      **Sovie and Segui Provide Powerful Additional Support**

      Of all the cases relied on by the government, the *Sovie* case is cited seven times, more than any other case.  That is because the government erroneously concludes that the case supports its contention that the liberal use of a defendant's criminal record is fine (propensity concerns and petty details be damned), so long as it is "directly relevant to whether the defendant intended or knew that his words would be received as a threat." Gov. Mot at 8.  But *Sovie* actually hurts the government's position more than it helps.  In that case there was a tight weave between the threat and the Rule 404 (b) evidence.  Sovie had threatened to beat up an ex-girlfriend, and he actually beat up two ex-wives. He harassed these vulnerable women with *hundreds* of phone calls. Crucially, *he told the ex-girlfriend that he beat the two ex-wives.*  The Second Circuit affirmed the testimony of the two ex-wives about the abuse they suffered, sensibly, because it proved that Sovie was not just letting off steam when he threatened to beat the ex-girlfriend.  *See Sovie*, 122 F. 3d at 126.

      The government would have a great argument in this case if Mr. Levy had previously punched two other Parole officers, and then told the demeaning SPO that sometimes he felt like punching her because of her disrespectful conduct.  That is hardly the situation here.  The government claims that various unnamed Parole officers who were not on the call with Mr. Levy will testify that they perceived the quick, short utterance of the fast-talking Mr. Levy, not to them but to someone else, as a true threat.  They know a true threat when they hear one because they are all tough and objective Parole officers who have been trained to put up with a lot in their jobs, like cops who are provoked.  They try hard not to jump to conclusions; they withhold judgment all the time; and they would never ever cry wolf on a true threat, even if it were not aimed at them, and even to back up a colleague in a blue wall of solidarity.  Is the government kidding here?  Is the Pope Catholic?

      Moreover, the prosecution has made absolutely no showing, by affidavit, affirmation or otherwise that other Parole officers who were not speaking to Mr. Levy really even heard what he said.  Who are they? Where were they standing?  How loud was the speaker phone?  Was Mr. Levy speaking softly?  How fast was he speaking?  What exactly do they remember themselves?  What was told to them and by whom? What exactly did they hear about Mr. Levy's character?  When did they hear it?  What hearsay did they learn about the shank and when?  What hearsay did they learn about the teenage conviction and when?  Who told them about the Old Timers investigation?  What details did they hear about it and when?  Who told them what?  And, more

The Honorable Rachel P. Kovner
November 16, 2020
Page 13

important, did the Parole officers ever compare notes in a classic case of confirmation bias, rendering the probative value of their testimony close to nil?  As to the SPO, recall that she too did not speak to Mr. Levy, unlike Sovie and his ex-girlfriend.  Finally, we reiterate that it is not as if Mr. Levy took the offensive like Sovie.  Mr. Levy did not dream up his threat as Sovie did, and then call Parole.  Mr. Levy did not call Parole multiple times every day to harass and scare and threaten the recipients.  On January 27, 2020, Mr. Levy did call Parole at all; and Parole called Mr. Levy just once.  In other words, Mr. Levy would have to have formed his intent to threaten lickety-split, which makes no sense.

Those are just some of the reasons this case is limping badly, and a successful Rule 29 motion may finally put it out of its misery.  We feel sorry that the jury, the Court, the prosecution and us will all have to expend considerable effort to try this case during the worsening third wave of this pandemic, with as many as 180,000 new Covid-19 cases in a single day and hospitalizations at record levels, especially for those over 65.  But if the trial does go forward, the arguments above present even stronger reasons not to let putrid Rule 404 (b) evidence turn a clean trial into a dirty one. *See McCallum*, 584 F. 3d at 477 (coining memorable phrase "propensity evidence in sheep's clothing").

In putting together the elements of a Rule 404 (b) decision in a recent interstate threat case, no decision we have read is more germane, more coherent, more thorough and more fair-minded than a decision by the Eastern District's own Judge Matsumoto last year in the *Segui* case. *Sovie* and *Segui* together deserve a special section in this response to the government's motion.

**1. Clear, Direct Communication in Writing vs Unclear, Indirect Communication Not in Writing**

As discussed earlier, Segui was a disgruntled graduate student who allegedly threatened to kill his professor because of Segui's failure to flourish in his studies. The alleged threat in *Segui* was more definite. It was in writing, not made orally or to a third party. It accused multiple professors, including John Doe, of being "monsters…. who don't deserve life. The world would be better without you." It claimed there would be no acceptance of professional wrongdoing by Professor Doe "short of tying you down and cutting off your fingers." *Segui* at 48. And it dehumanized Doe and his special needs child with exceptional cruelty: "I'm so glad that son of yours is a mute deformed autistic little shit." *Id.*

In this case, by contrast, even the prosecutor and his own case agent have different renditions of a very short utterance and, seemingly, cannot even get the content of the alleged "threat" straight. The cruel statement about the son in *Segui* was admitted under Rule 404 (b) under a compelling rationale: because this dehumanization of a vulnerable child was deemed "relevant to Mr. Segui's intent to threaten harm to John Doe." *Id*. at 44. It bore on whether this "would be interpreted as a threat by those [John Doe] to whom the maker was communicating."

The Honorable Rachel P. Kovner
November 16, 2020
Page 14

Id. at 43. But in Mr. Levy's case the utterance was not even addressed to SPO Jane Doe but to a third party Parole officer. Evidently the harsh SPO knew she had lost any credibility with Mr. Levy and pawned off calling him to another Parole officer who was nice and who relaxed the overstressed Mr. Levy and made him comfortable in confiding about the bad treatment he had to endure from the callous SPO. That makes a difference. *See United States v. Hanna*, 293 F.3d 108, 1086 (9th Cir. 2002) (cited by Judge Matsumoto, where evidence was excluded because alleged threat documents had little bearing where there was no direct communication between parties.)

In sum, there is no warrant to admit a highly inflammatory 15-year-old attempted murder conviction to get at its effect on the SPO, because Mr. Levy never even communicated with her, either in writing or orally. Rather, he communicated with the nice second Parole officer. He did not write or say anything arguably "threatening" directly to the SPO, unlike Mr. Segui and the professor and unlike Mr. Sovie and his ex-girlfriend.

2. **The Ax and the Shank**

If the Court now has doubts about whether this trial will be a waste of precious time, trouble, and health and safety resources, consider that Mr. Segui was acquitted even though he was (1) arrested at Port Authority en route to Michigan where the professor lived; (2) admitted he was traveling there to kill the professor with an ax; and (3) an ax and packaging addressed to Mr. Segui were recovered in a search. The ax was admitted as evidence because it truly completed the story of the threat. The shank incident that the government seeks to introduce here, on the other hand, completes only one argument by the prosecutor that this Court should not countenance: "Ladies and gentlemen, you know that this brief, non-written 'threat' to a third party where the case agent and the witnesses are not even sure of the wording, was a true threat. How do we know that? Because eight years earlier, this defendant, to protect himself in a violence-prone upstate prison, was found with a shank. That tells you he is guilty here because he has a propensity to threaten and then commit violent crime, even though the shank was never used."

3. **Surgical Google Searches vs. a Swing-for-the-Fence Squeeze**

The government strains to fit cobwebbed, highly inflammatory violent crime convictions into a threat case already dismissed by State Parole authorities where it has the option of proving the alleged threat through normal circumstantial evidence. But even worse than dredging up a teenage nightclub shooting and a shank from long ago is dredging up the shards of a seemingly stalled investigation into the Old Timers' Day shootings. Apparently, someone thought, "Why not enlist the resources of the feds and Covid-fearing jurors in making Keith Levy miserable to the point of trial until he gives law enforcement officers the leads they think he has but are wrong about? Judge Matusmoto does not come close to admitting the kind of flimsy proof the government seeks to discuss here (such as a gun with someone else's DNA on it). The extrinsic proof she allowed under Rule 4040 (b) in *Segui* involved surgical Google searches: 1) how to

The Honorable Rachel P. Kovner
November 16, 2020
Page 15

travel to where Professor John Doe lived, 2) his academic schedule, and 3) whether one can kill someone with a butter knife. *Id.* at 37. These searches related directly to Mr. Segui's threat, and show that he "acted in a manner consistent with his threat of harm to John Doe." *Id.* at 25. In addition, like in *Sovie* the probative value was enhanced by the temporal relationship between the acts, very unlike the facts in Mr. Levy's case, where Mr. Levy seemingly did nothing before or after his lone utterance to follow through on anything.

Since the *Elonis* case in 2015, a defendant must be shown to have intended a threat. Those Google searches helped establish intent in *Segui*, which ultimately was found wanting, because the jury apparently found Mr. Segui's actions a product of emotional instability rather than malice. But Judge Matsumoto was so careful that arguably admissible searches like one about buying poison or life on Rikers Island with fewer close parallels to the alleged threat were excluded because they "[risk] unfair prejudice and confusing the jury." *Id.* How much more so here, when there is only a very weak connection between the proffered Rule 404 (b) evidence and the case at hand, thereby cementing the case for exclusion. A swing-for-the-fencing squeeze of Mr. Levy in an attempt to secure hoped-for information is not a permissible basis in admitting Rule 404 (b) evidence.

**F.     Conclusion**

For the reasons set forth above, the Court should deny the government's motion to admit evidence of Mr. Levy's two prior, ancient, unconnected, deeply inflammatory convictions when he was much younger. It should also deny the admission of highly conjectural suspicions of his involvement in the Old Timers Day shootings, mere wisps of proof that, well over one year later, apparently cannot even meet a probable cause threshold but are no less unfairly prejudicial.

Sincerely,

*/s/ Gordon Mehler*
Mehler Law PLLC
747 Third Avenue, 32nd Floor
New York, NY 10017

*/s/ Christopher D. Wright*
305 Broadway
Suite 1001
New York, New York 10007

*Attorneys for Defendant Keith Levy*