UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------x

UNITED STATES OF AMERICA,

        -against-　　　　　　　　　　　　　　　　**ORDER**
　　　　　　　　　　　　　　　　　　　　　　　　　　　　20-CR-87 (RPK)
KEITH LEVY,

              Defendant.
-----------------------------------------------------x

RACHEL P. KOVNER, United States District Judge:

      Keith Levy is charged with violating 18 U.S.C. § 875(c) by communicating an interstate threat to kill or injure a parole officer. *See* Indictment (Dkt. #7). The government has sought leave to introduce evidence relating to the defendant's criminal history and uncharged conduct. *See* Andrew Wang Oct. 20, 2020 Letter 1 (Dkt. #37) ("Gov't Letter"). The government also seeks introduce evidence of an incident where a different New York state parolee shot a parole officer. *See* Andrew Wang March 1, 2021 Letter 1 (Dkt. #58) ("Gov't Second Letter"). The defendant opposes under Fed. R. Evid. 401, 403, and 404(b). *See* Gordon Mehler & Christopher Wright Nov. 17, 2020 Letter 5 (Dkt. #40) ("Defense Letter"). As stated at the conference on April 5, 2020, the government's motions *in limine* are granted in part and denied in part.

## BACKGROUND

      The government alleges that the defendant violated 18 U.S.C. § 875 when he said, "in sum and substance, that he wanted to get 'the hammer' and shoot [his senior parole officer] in the face." Gov't Letter at 3. It seeks to introduce four categories of evidence as bearing on how the statement would have been understood by the defendant and by a reasonable observer familiar with the statement's context. First, the government seeks to introduce evidence relating to the defendant's convictions in 2006 for second-degree attempted murder, first-degree attempted assault,

1

second-degree criminal possession of a weapon, and first-degree reckless endangerment. *See Id.* at 1, 6. According to the government, those charges arose out of an incident in October 2005 when the defendant brandished a gun and fired into a crowd in front of a nightclub. *Id.* at 1. He missed his intended victim, but several innocent bystanders were hit by bullets. *Ibid.* The government seeks to "introduce only enough evidence to show that the defendant was in fact convicted of those crimes based on a nightclub shooting." *Id.* at 10.

Second, the government seeks to introduce the defendant's 2014 conviction for first-degree knowingly making or possessing dangerous contraband in prison. *See id.* at 1, 6. According to the government, that conviction arose out of the defendant's possession of a shank in December 2012, when the defendant was serving his sentence for his 2006 convictions. *Id.* at 1. Beyond the conviction itself, the government indicates that it seeks to introduce testimony from parole officers that they credited the defendant's threat in this case because they believed that the "defendant had a shank in prison," *id.* at 6-7, as well as "evidence tending to prove the fact[]" of this act, *id.* at 7.

Third, the government requests permission to introduce evidence relating to the "defendant's suspected involvement in the Old Timers['] Day shooting." *Id.* at 6. In July 2019, at least two people participated in a gunfight at an annual Old Timers' Day event in Brownsville, Brooklyn, where one bystander was killed, and eleven more were shot. *Id.* at 2. According to the government, the defendant has been "identified as a person of interest and potential suspect" in the exchange of gunfire because (a) he placed himself at the site of the shooting during a phone call with an inmate on Rikers Island; (b) an eyewitness identified the defendant as being one of the shooters involved; (c) the New York Police Department ("NYPD") found a handgun used in the shooting a few feet away from his mother's apartment; (d) the NYPD found the DNA of the defendant's friend on the gun; and (e) when interviewed by detectives, the defendant admitted that

he was at the Old Timers' Day event. *See ibid.* The government also notes that the defendant referred to guns as "hammers" during his interview with the detectives, *ibid.*, and also referred to "hammers" during his conversation with the inmate at Rikers Island, *id.* at 2 n.1.

The government indicates that it would introduce testimony from the defendant's senior parole officer and other parole officers that they believed the "defendant was a potential suspect in the Old Timers['] Day shooting," *id.* at 7, as well as "evidence tending to prove" that he was in fact as suspect in the shooting, *ibid.* The government would also offer the evidence noted above that the defendant referred to guns as "hammers." *See id.* at 8.

Fourth, the government seeks leave to introduce "witness testimony regarding a 2010 incident in which a New York state parolee shot a parole officer." Gov't Second Letter at 1. News of that shooting became common knowledge and a cautionary tale among state parole officers. *Id.* at 2. The defendant's senior parole officer and another parole officer who heard the defendant's statement would testify that they knew of this shooting at the time they interpreted the defendant's statements. *Id.* at 3.

## DISCUSSION

The government's motions *in limine* are granted in part and denied in part. The government may introduce evidence that (i) the defendant was on parole for a conviction for a crime that involved the discharge of a firearm, (ii) the defendant was interviewed by NYPD detectives who wanted to find out if the defendant had information that would be useful to an investigation of a gun crime; there, he referred to guns as "hammers," and (iii) the defendant's parole officers knew that there had been an incident in 2010 where a parole officer had been shot by a different parolee. The motions are denied in all other respects.

### I.  The Defendant's 2006 Convictions

The government may introduce evidence that the defendant was on parole for a conviction that involved the discharge of a firearm.  In this case, the government bears the burden of proving beyond a reasonable doubt that the defendant communicated a true threat and was at least aware of the threatening nature of the communication.  *See Elonis v. United States*, 575 U.S. 723, 726, 732 (2015).  Whether a statement constitutes a true threat turns on "whether an ordinary, reasonable recipient who is familiar with the context of the [statement] would interpret it as a threat of injury."  *United States v. Davila*, 461 F.3d 298, 304-05 (2d Cir. 2006).  But the "mental state requirement" of Section 875(c) requires more than proof "that a reasonable person would regard [the] communications as threats."  *Elonis*, 575 U.S. at 740.  A defendant must at least "be aware of the threatening nature of the communication."  *Id.* at 726.  While there is some uncertainty as to whether recklessness suffices, the mental state requirement is met at least "if the defendant transmits a communication for the purpose of issuing a threat, or with knowledge that the communication will be viewed as a threat."  *Id.* at 740.

Assuming that Rule 404(b) applies to the fact that the defendant was on parole for an offense involving discharge of a firearm, evidence of that fact is admissible under that rule.  First, evidence of that fact is offered for a proper, non-propensity-based purpose.  Specifically, that fact is offered as evidence of, and is highly relevant to, "whether an ordinary, reasonable recipient who is familiar with the context" would have understood the defendant's alleged statement that he wanted to get the hammer and shoot the parole officer to be a genuine "threat of injury," *Davila*, 461 F.3d at 304-05.  That background is also exceedingly relevant to whether the defendant would have known that the parole officer would understand the communication as a threat or whether he intended to convey a threat to the parole officer.  The probative value of this fact is not "substantially outweighed by . . . unfair prejudice" or any of the other considerations set out in

4

Federal Rule of Evidence 403. Nevertheless, applying Rule 403, I decline to allow the government to offer any further detail about the 2006 convictions, including about the underlying conduct and the precise nature of the charges. The parties are directed to confer and propose an appropriate limiting instruction pertaining to the evidence that the defendant was on parole for an offense involving the discharge of a firearm.

## II. The Defendant's 2014 Conviction

The government may not offer evidence that the defendant was convicted of possessing a shank in prison in 2014. To be sure, that evidence has some bearing on how a reasonable person familiar with the context would have understood the defendant's words to his probation officer. And it has some bearing on how the defendant would have expected his words to be understood. But that relevance is more limited than the relevance of the defendant's conviction for an offense involving discharge of a firearm, because the conduct underlying the 2014 conviction—possessing a shank in prison—is different in kind from the conduct allegedly threatened by the defendant. And the evidence may confuse the issues and derail the trial as the parties put forward competing evidence to contextualize why the defendant possessed a shank while in prison. *See, e.g.*, Defense Letter at 11. Accordingly, the government may not introduce evidence that the defendant was convicted for knowingly making or possessing dangerous contraband while in prison.

## III. Evidence Relating to the Old Timers' Day Event

The only evidence that the government may offer related to the Old Timers' Day shooting concerns the defendant's use of the term "hammer" to refer to a gun. Again, all of the evidence that the government seeks to offer relating to the Old Timers' Day shooting is offered for, and relevant to, a proper purpose. Evidence that the defendant was a suspect in a recent shooting incident would bear on how a reasonable recipient of the statements in this case—familiar with that surrounding context—would have understood those statements. Similarly, the defendant's

5

knowledge that he was a suspect in a recent gun discharge—and that parole officers knew as much—is evidence bearing upon how the defendant would have expected his parole officers to understand the statement he is alleged to have made in this case.

But only a limited portion of the Old Timers' Day evidence survives the Rule 403 balancing analysis. Specifically, the government may introduce evidence only that (i) the defendant was interviewed by detectives who wanted to find out if the defendant had information that would be useful to an investigation of a gun crime, and that (ii) during that conversation, the defendant referred to guns as "hammers." That evidence is highly relevant: the defendant's prior use of the term "hammer" to refer to a gun is significant evidence of the meaning of the alleged statement that the defendant wanted to get "the hammer" and shoot his senior parole officer in the face. Gov't Letter at 3. Further, understanding that the defendant made these references during the interview with NYPD detectives where the detectives sought information about a gun crime is necessary to understand why the defendant would be referencing "hammers" at all. Neither of these facts are particularly inflammatory.

As to the government's remaining evidence relating to the Old Timers' Day shooting, however, unfair prejudice substantially outweighs the evidence's probative value. Evidence that the defendant was a suspect—including evidence that the defendant was identified as a person of interest, that the defendant placed himself at the scene during a call with an inmate on Rikers Island, and that the defendant was identified by an eyewitness as one of the shooters involved—is likely to be inflammatory because the Old Timers' Day shooting reflects conduct far more sensational than the threat charged. Further, such evidence is likely to lead to an ancillary minitrial on the defendant's actual involvement in the Old Timers' Day shooting. The government, for example, suggests that it has evidence that the NYPD found a handgun used in the shooting a few

6

feet away from the defendant's mother's apartment; that the NYPD found the DNA of the defendant's friend on the gun; and that the defendant admitted during his interview with NYPD detectives that he was at the Old Timers' Day event at the time of the shooting. *See Id.* at 2. The defense contests the allegations of the defendant's involvement. *See* Defense Letter 11. Such disputes are likely to confuse and distract the jury as they assess whether the defendant made a threat in violation of Section 875(c).

The parties are directed to confer and propose a limiting instruction regarding the defendant's NYPD interview if they believe such an instruction would be appropriate.

### IV.   Evidence Relating to the 2010 Shooting of a Parole Officer

Lastly, the parole-officer witnesses may testify that, at the time they heard the defendant's statements, they were aware of a 2010 incident in which a (different) New York state parolee had shot a parole officer. Gov't Second Letter at 1, 3. That history is relevant context bearing on whether a reasonable recipient "familiar with the context of the [the defendant's statement] would interpret [the statement] as a threat of injury." *Davila*, 461 F.3d at 304-05; *cf. United States v. Davis*, 876 F.2d 71, 73 (9th Cir. 1989) (affirming decision to permit "testimony regarding [a] judge's knowledge of a prior assassination of a federal judge" where defendant was charged, among other things, with "threatening to murder a United States judge with intent to impede, intimidate, interfere with, or retaliate against such judge"). This brief testimony concerning an act by a different parolee does not risk unfair prejudice that substantially outweighs the evidence's probative value.

## CONCLUSION

The United States' motions *in limine* at Dkts. #37 and #58 are granted in part and denied in part.

SO ORDERED.

>        */s/  Rachel Kovner*
>        RACHEL P. KOVNER
>        United States District Judge

Dated:        April 9, 2021
              Brooklyn, New York